Please be seated. Good morning. This case on the dot 2-14-0272. You hold the state of Illinois plaintiff's affidavit. The McNabb v. McNabb, defendant Ellen. Arguing on behalf of defendant Ellen, attorney Mr. Jack Killebrand. Arguing on behalf of the plaintiff's affidavit, attorneys Allen and Smith. Good morning, Mr. Goldman. May it please the court. Mr. Hildebrand, before you get started, you had filed a motion to reconsider the state's motion to strike some citations and arguments related to medical studies. Yes, ma'am. That weren't presented at trial. The motion panel had granted that motion, and you filed the motion to strike. I would like for you, at this time, to argue, or if you'd like to make any arguments with respect to that motion to strike before we proceed with your argument on the case. In cases where there is complex scientific evidence and the appellant is asking for a reversal based on something that the defense experts testified to, how willing is a court going to want to reverse without having any idea if that's even a legitimate argument that came from the defense side? So the reason I cited those was to help the court. The state did not cite any arguments that are actually based on those because there aren't any. None of my miserable dog arguments are based on those. You had cited in your motion this Schmidt case, which I think was an IRS, it was an article in some federal IRS audit report. In this case, aren't you citing your articles in support of your expert's testimony, unlike that particular case? Well, I'm arguing that the expert's testimony, Dr. Ockhoven's testimony, is reasonable, but you don't have to take my word for it. This is something that is not something I made up. Are the exhibits you're attempting to supplement the record with articles which your expert referenced in support of his opinion that he gave at trial? I don't believe that those were used. Were these articles or exhibits submitted to the trial court for admission into evidence? The things which you are attempting to supplement the record with, were they submitted to the trial court? These articles? Yes. No. How are we supposed to go outside the record? I'm not asking the court to go outside the record. Well, if these weren't in the record, then if we allow your motion, won't we be going outside the record? No, because I'm not asking the court to rely on the record. This is just, if the court finds that these are not helpful, then ignore them. But I think this is a legitimate... Well, if you're not asking us to go outside the record, then what exactly are you asking us to do, to enlighten ourselves in a particular area of mental health? In a way, yes. But this court may already know all this information. I don't even know. I mean, when we argue reasonableness, our reasonableness determinations are based on all the information that we've gathered all our life. If you feel that this isn't helpful... I think that's instruction 101, but I'm not positive. In the Sandry case that you cite, in Sandry, that was an issue with P. Knopf of Bismarck. That was a Frye issue. We don't have a Frye issue in this case. No, we don't. Okay. So in this particular case, then isn't the standard a little different than in the Frye case? Sandry was de novo. This case, it's basically beyond a reasonable doubt. So you're asking us to take in testimony or arguments that support the doctor's testimony at trial. Are you not? Well, the way I worded it, I said what she testified to was reasonable. It's supported by other witnesses. Okay. We'll take that into consideration. I just wanted to hear your basis for the motion. If the court doesn't want to consider those, I have no problem with that because my argument is based exactly on the evidence that was presented at trial. Okay. There's a lot of complex medical evidence in this case, but this case is actually a really easy case for this court to decide because it's not a shaken baby syndrome case. It's a choking case. The paramedic, Hannibal R. Pearson, testified that there was something blocking Tyler's airway. And when she got there, he was very blue. He's choking to death. She immediately picks him up and starts doing CPR. So now we have a professional giving CPR. She's a paramedic. And what happens after she gives him CPR? Nothing. He's still blue. She didn't get any air into his lungs. Why? Because something was blocking his airway. He's choking to death. She gets him on the ambulance. Still blue. She figures, I have to do something. So she puts the tube down through his mouth to his lungs. And what happens? He turns pink. His heart rate goes up. He's suddenly flushed with oxygen-rich blood. But what does Oppovin say about that? Of course, yes, when she put the tube in, it pushed through whatever was blocking the airway. That's why he's pink and dumb. That's why his heart rate went up. And she explained that choking, the lack of oxygen, could cause every single injury in this case. And it only takes five minutes of lack of oxygen to cause permanent brain damage. That's what happened in this case. Now, if choking explains everything, then what about Dr. Glick's testimony that the only explanation is shaken baby syndrome? What about choking? Well, she has an answer for that. And the answer was children don't stop breathing when they choke. And that was made on page 1215 in my reply brief. I cite it as 1216, but it's page 4. This is not the only unreasonable claim that Dr. Glick made to say that this choking had absolutely nothing to do with this, has absolutely nothing to do with shaken baby syndrome, because she went on to testify that the lack of oxygen will not cause blood on the brain or in the eyes. Well, she's alone in that claim because she was contradicted not just by Dr. Oppovin, but by the state's own doctor, Dr. Wakeham. He said, yeah, you can get blood from lack of oxygen on the brain and in the eyes. Her inconsistent testimony, Dr. Glick's inconsistent testimony, did not stop there. She then went on to say there's a large amount of blood on the brain. That is a significant issue because if there's a large amount of blood on the brain, that is indicative of a violent shaking because during the shaking, the brain has these veins in it. They're called bridging veins, and they tear. That's part of shaken baby syndrome. And when that happens, there's a lot of blood in those veins because that brings all the blood from the brain back down to the heart, and that leaks a lot of blood. The only problem with Dr. Glick's opinion is there wasn't a large amount of blood on the brain. But she is alone in that opinion. She's contradicted by the MRI, and she's contradicted by every other doctor in this case. What did Dr. Oppovin say? You said the MRI said there was no blood? There was small spots of blood that had a thin layer. No, you didn't answer my question. I'm sorry. Did the MRI say there was no blood? You said only small amounts. I'm just asking, was there blood or was there not blood in the brain? Well, that's debatable because they just saw a hyperdense material, which could be blood, or it could have been just liquid from the brain, which is black. There's water in the brain, and that's black. So when they say hyperdense— It depicts in the image as black. Pardon me? It depicts in the imagery as black. It's not a black liquid. That's right. It's clear, but it is depicted in the imagery as black. That sounds like a very reasonable explanation. Mr. Alderbrant, what you're asking us to do, basically, is to reweigh the evidence and assess the credibility of the experts. Didn't the jury already do that? Didn't the defense have an opportunity to cross-examine these witnesses and bring out what you're saying here today? Yes. Okay. So how is it that we have to find that no rational trier of fact could have found that the injuries were the result of the shaken baby syndrome, or we have to find that the evidence is so unreasonably improbable or unsatisfactory and creates reasonable doubt? That's what you're asking us to do. Yes, yes. So you're basically asking us to reweigh all the evidence that was presented at trial. Absolutely, I am. And how do we do that here? By looking at the evidence. So you're submitting it so unreasonably. It's absolutely unbelievable that this condition can stand on the absolutely unreasonable and unbelievable testimony of Dr. Glick. No rational person should ever have found the defendant guilty of this. You're also in your argument, and I think Ophaven had talked about this, if I can pronounce it, cortical CVT. Yes. And he said the tests weren't done. Yes. And then Wakeman said that there would have been indicators on the MRI if that were the case, therefore then the tests would have been done, but there were no indicators on the MRI. Isn't that, again, information that the jurors have to weigh the credibility? Do we believe Ophaven or do we believe Wakeman on that? The jurors didn't have that information. The jurors had information that thrombosis was indicated on the MRI. Oh, really? Yes. Okay. And Dr. Wakeman didn't even bother with it. On page 958, he's actually asked about that. Defense counsel goes, well, what do you do when thrombosis is indicated? And Wakeman says, you order an MRV. That MRV is specific for identifying that. But he didn't say, the question wasn't, well, thrombosis was indicated here, so what do you do? He said if thrombosis is indicated, what would you do? Right. And it was indicated. There's a testimony. Who testified that it was indicated? Dr. Ophaven. On what page of his testimony? Oh, I can look that up. I don't know the page number. But that was clearly identified. The radiologist said there was venous problems, and she explained what that is. And that is indicating thrombosis. And so there could have been a blood clot. And so Wakeman says, we know why Wakeman didn't order anything. He told us why. Because he said that he knew immediately this was shaken baby syndrome to nothing else. Nothing else could explain this was shaken baby syndrome. And he does not order tests to rule out other causes when he knows what the cause is. Because those are tests that cost a lot of money. He's not going to waste money on that. So when the state says that they ruled out all these other causes, they didn't. Not with medical evidence. They ruled it out with their personal opinion that this was shaken baby syndrome and nothing else. There's no medical evidence that ruled out not only was thrombosis indicated, but infection was also indicated. And they didn't do anything about that. Well, wouldn't the jury have weighed the fact that Dr. Glick is still an active practitioner and sees 300 children a year in her consultations and sits on a review panel that reviews all potential child abuse cases. Wouldn't they weigh that with the fact that Dr. Oppoven hasn't actively worked with children since 1979, has retired from doing autopsies and is a paid consultant. Wouldn't they have factored in all of that? They would have factored in every piece of evidence that was presented, which includes that. And they would have factored in that Dr. Glick gave consistently inconsistent testimony, totally unreasonable testimony, and based her opinion on that. So you're saying they would have considered all that? They should have. How could any reasonable person convict the defendant of this crime based on her testimony? I mean, the most, the best indication of shaken baby syndrome is a large amount of blood on the brain because the bridging veins are torn. She is alone in saying that there was a large amount. And what did Oppoven say? She said they were so small, there's no way the bridging veins caused that. And she said those small ones actually are perfectly consistently, are consistent with an oxygen deprivation. The injuries were consistent with choking, not with shaken baby syndrome. But Glick, she's going to stick with it. And then even on cross-examination when defense counsel goes after her on this, saying, oh, so the radiologist is wrong here, saying that there's just little spots within. She holds off for a while, and then she just throws up her arm and says, okay, thin, small, doesn't matter. Because even a small amount of blood is a serious injury. Well, I think we can all agree with that, but not in shaken baby cases. It is, it does make a big difference whether it's a small or a large. So there she's just jumping the other way. Since we took some time on your motion, I'm going to ask you to address your final argument, which I believe is closing argument. Okay. In order to find, in order to find, well, first of all, did you forfeit this? I mean, you never raised this issue. They never raised this issue before. That's right. So why is it not forfeited? It's plain error. That's how I argued it. And before we find plain error, we have to determine whether or not there was in fact error. Correct. What was the error? The error in this case was flicked repeatedly and emphatically testified. Children do not get whiplash injuries over and over again in her testimony. And then the State argues in closing that there can be these microscopic ones that don't show up on CAT scans or x-rays. She left out the MRI part on this. Now, the State, Ms. Swiss, in her brief says, well, this is based on Glick's testimony on page 1202. So on that, that's during cross-examination with defense counsel is pressing her on this. How can you say that Tyler was shaken so viciously and there's nothing, there's no injury on his neck? She said, well, you know, there are nerves that control breathing that run from the brain to the lungs. She goes, there is a concern that there may be stretching. Stretching? I'm not sure even what that means. But it doesn't matter because in that same paragraph, in that same page, she flip-flops back to no injuries. She says, you know, children who do not die from shaken baby syndrome and do well, you know what? They don't have injuries. Now she's back to now they don't have injuries. But what about Tyler? He's not doing, he didn't do well. Where are his neck injuries? Well, she's got an answer for that, too, in the same paragraph, that same page. She says, you know, with these nerves on x-rays and CT scans. And she's on MRI, too. Was that intentional? She says, on those two, technically, whatever that means, technically we don't see injury. Really? We don't have the equipment to see injuries in today's world? That is just unbelievable. Especially when she got done saying, absolutely, I studied this for two years, no injuries. And then she comes, this is a deceptive argument. Right. But where is that, what she said in her cross-examination, how is that inconsistent with what the prosecutor presented in closing argument? It's inconsistent with Glick's testimony that there are no injuries. Well, the prosecutor argued that Dr. Glick testified that babies who are violently shaken do not have neck injuries. It can be seen by imaging and clinically often do not have findings of neck injuries. That's what Glick testified to and that's what the prosecutor put out there, correct? As unbelievable as it is and as outrageous as you may think it is, she didn't misquote what Dr. Glick said in the closing argument. I suppose you could read page 1202 of that, but that's the only time. Right. And other than that, she was emphatic that there's no injuries. Now all of a sudden there are? And she contradicted her. I understand exactly what you're saying. And I don't disagree that there may be contradictions, but the prosecutor purported to the jury in closing argument what Dr. Glick said, as unbelievable, as inconsistent as that may be. Right. How is that improper? Because she never said that there's microscopic. She never said, you know, if she wanted to be real accurate, she should have said Glick said there are no injuries out of all her studies and everything. But technically, because that's what she says, technically, whatever that means, we don't see them in these types of tests? What about an MRI? I think didn't she say Dr. Glick acknowledged on cross-examination that there were articles in the medical literature indicating shaking alone without neck or injuries could not lead to brain damage. I mean, she was saying what Glick said is, like I said, is unbelievable or as inconsistent as you may believe it is. It was really consistent with the testimony. Justice, if that is your conclusion. No, that's not my conclusion. I'm asking you if that is the conclusion. How is that? How is that? It's not improper argument. How is that improper argument? If that's exactly what you said. It's improper argument because Glick repeatedly said this wasn't. And all of a sudden it's a deceptive argument. It just seems wrong. All of a sudden what? All of a sudden this is now in the closing argument, this deceptive thing that came through. And if it is based on the evidence, then I have no claim here except that, well, then this court should reverse based on reasonable backgrounds. Because she just flip-flopped on cross when she was confronted with how could there be no neck injuries. You're right. You're right. But that's my point. If she flip-flopped on cross and you think it's inconsistent, how is it unfair for the state to put out there in closing argument what was testified to in opening or in direct and in cross? Other than. Other than that it's a deceptive argument. Correct. If that's what that says on page 1202, because I can't follow it, to me it's just doesn't make rational sense. It sounds like what you're arguing is that this is prejudicial or this is error because the prosecutor is attempting either intentionally or with reckless disregard for the truth to confuse the jury. And apparently it worked on defense counsel and I think you just indicated it worked on you. Okay. I have a question relative to the prosecution. Why did it take six or seven years for this case to go to trial? Part of the problem was Dr. Glick is so busy. In other words, the scheduling of the trial was in need because of his schedule? She cancelled several times because of conflicting schedules and I believe that the judge actually was getting upset with it. Maybe you have to get it different. Did the defendant ever seek a speedy trial, demand or file? No. That was added. Have you considered filing on appeal in effectiveness of counsel from the basis that no speedy trial demand is filed? No, I did not consider that. Did you ever consider the possibility that a six-year delay in the prosecution might violate his constitutional rights relative to a speedy trial? No, I did not consider that. Thank you. I have no further questions. Thank you so much. You have an opportunity, Mr. Valdebrand, for a rebuttal. Ms. Swiss. Good morning, Your Honors Counsel. At first I would like to ask, Your Honors, if you have any questions of me regarding the motions practice in terms of the literature, the medical literature that was referred to that was not presented. Are there any questions on that? Do you agree that it wasn't part of the record? It was not part of the record. That's all I need to know. Okay. But counsel argued in his motion reconsider the Schmidt case and the Sandry case. Can you distinguish those two cases from the case before us? Well, I certainly can, Ms. Sanders, because that's a Frye issue. And I think I cited the case in my brief that talks about how the Simons case also is a Frye issue, and that's where the wording actually came from in terms of allowing these types of additional materials to be looked at. And there you're looking at a de novo standard of review. Here we're looking at, you know, a reasonable doubt. So we're looking at it in the evidence, the evidence before the jurors, and determining whether they could have, in the light most favorable to the State, determined as a reasonable trial fact. That's the difference, and I think that calls for a different result. Okay. Is it safe to say that the postulation of this shaken baby syndrome has been discredited in the recent past? No, I would not say that's true. You know, I certainly didn't read voraciously on this topic since then and try to determine how many people feel one way or the other. Obviously, if there had been a Frye issue brought up on appeal or something, I would have been looking more at that. I didn't look at that. There certainly is a split amongst the medical community, and that was told to the jurors. They knew. Even Dr. Glick said there was a split. She considered it to be a minority, but she still said 5%, I think, is what she estimated it to be, would say that in fact that unless there is some evidence of blunt trauma that actually that's not what she said. She said that there's a 5% difference in terms of people who believe that shaken baby, that shaking alone can cause this. And so the jurors were aware of the split. Obviously, they were aware of it because they had two experts testifying, you know, really in a diametrically opposed way about whether this could be the proper determination of cause or not. So in terms of how many, I wouldn't know, but certainly there is a split. In terms, I would like to address what defendant brought up mostly in his reply brief. That's to say that the jurors could not have found Dr. Glick credible because of certain inconsistencies and contradictions. First, he really argues that Dr. Glick said that choking cannot cause a cessation of breath. Taking out of context some of her statements, she does say that. But the context is that we are looking at another expert who says that this child choked on vomit. That what we know here factually is that the child had had formula earlier that day. There's nothing in any facts that show any type of, the child was put in a car seat, was there for 20 minutes, 15, 20 minutes, something of that sort by the defendant's own testimony before this occurred. There's no indication factually. There's nothing from the expert talking about any type of choking on an obstruction other than the formula. So we're talking about vomiting of formula and that being the choking. In that context, Dr. Glick was asked to determine whether that could have caused the cessation of breath. And she said no, that formula, you know, that children vomit up formula all the time. That's why you burp them. But that's, they don't, you don't normally see people rushing them to the hospital all the time because the child has completely ceased breathing. That just doesn't occur. And in this case, we actually have a child, too, who is not a newborn baby put on its back where vomit could be asphyxiated and the child could not turn or something. We have a three-month-old sitting up in a car seat. Under those facts, these are the statements that she made. She doesn't contradict that in terms of, you know, saying, excuse me, she's not incredible because she says that. She later says at page 1257 that object obstruction could lead to the cessation of breathing. But there's no evidence of that here. There's nothing other than vomit that's ever talked about in terms of what could possibly have caused this child any type of choking. And that's only coming from Dr. Oppelman, who believes that it did cause choking. In terms of the contradiction, and this goes to not only issue number two, but also in terms of straightening out for the record, I think, what Dr. Glick said. She was not contradictory about the lack of neck injuries. What she said from the very beginning is that Tyler did not have documented neck injury. She was very careful when she said that because what she's saying is there's nothing which shows neck injury in him. And she says, what don't children have? They don't have whiplash injury, neck injury. She was asked in terms of whiplash. She referred to whiplash over and over. And then she described whiplash as soft tissue and possibly even bone instability. And she said they don't have whiplash injuries like adults do. Those are the types of things you see with whiplash. The neck is not just weaker here. It's different. It's anatomically different. And actually, the other, the expert, Oppelman and Wigum both agreed with that totally. They said the neck is different in an infant. So she said we don't see those type of injuries in children. But she never said that you would not see some type of injury. And when she was asked, she said, in fact, there are many doctors, including herself, who believe that there are these microscopic injuries present that could be determined or could be found if the child died in an autopsy. But they are microscopic, and they do not show up in imagery. So that was her statement all along. This isn't something she came up with that directly contradicted already something she had said. It's something different than a whiplash injury. And that makes the distinction and makes her totally consistent throughout. And in that respect, then, as to the second argument, and I think defense counsel has basically conceded this, the closing argument was based on evidence. She didn't say that. And obviously they have the right to bring out the evidence and any reasonable inferences in arguing to the jury. That's what they did. Can you be totally consistent and still be unreasonable? Well, Your Honor, certainly defense counsel has not suggested how. And I don't think so. If you're totally consistent and there is a factual basis and experiential, you know, she has the experience to know this, then I don't believe it could be totally, you know, incredible. So she was not contradictory. She was not inconsistent. And she did have the experience. She had more experience, more recent experience, and with more children than did the other expert. And that certainly counts for something, as well as just their credibility on the stand. Obviously something that's the trier of that is charged with determining. And they did so here. Were there areas where Dr. Wakeman's testimony contradicted Dr. Glick's? I cannot think of any, except that perhaps in terms of talking about the injury that could come to the neck, both of them agreed, and actually so did Dr. Oppo, that the ligaments are longer and looser in a child's neck or in a baby's neck than in an adult. But I believe Dr. Wakeman said it was so. When you say looser, I think you mean more flexible. More flexible. Otherwise their head might fall left or right. Right. Yes, they were talking about more flexible, more pliable. But I think Dr. Wakeman did say that there could be some microscopic injury to the ligaments, where she said it was to the nerves in the neck that would not be detected on imagery. So I think there was that inconsistency. Other than that, I think they were remarkably similar in their testimony. And I think that also goes to show that Dr. Glick's testimony is not incredible in any way, because we have here a treating physician, and he didn't rush to judgment. He did all sorts of tests. He ruled out luteric aciduria, which, according to Dr. Glick, was something that had to be considered because it does cause a bleed on the brain. So that's something that should have been considered, was considered, ruled out. Leukemia was ruled out. Platelet disease. They did a complete blood count. How about the CVT? Did they do testing on the CVT? Did they do what? Testing for CVT. Oh, for CVT? No, I don't believe they did, but the evidence of the thrombosis, I think, came only from what the radiologist saw in the lung. He saw some type of thickening in the lung, and he said the other possible cause could be because the paramedics originally, when they intubated Tyler, they put it in too far down, and so it wasn't equally giving oxygen to both. So they had to remove that, kind of adjust it, I guess. And he said that that could have caused this. Not only that, but that was ruled out. Thrombosis was ruled out because Glick said that the clot within the vein, the thrombosis, if that had happened in the central vein of the brain, it would cause a problem in the vein and not outside. In other words, I guess the extra pressure or whatever would come within the vein itself. It would not cause this large spread, diffuse bleeding. And what she said is that... Are you saying that a thrombosis doesn't result in hemorrhaging? If it does, her testimony was that it can once in a while go outside the vein, but only near the vein, and only for like a pinpoint bleeding. So very small spots, which she did not find to be consistent with what was shown on the imagery. Yes. And in fact, Wakeman agreed with that. Wakeman was asked a similar question and said that the blood, if there was a thrombosis, would be very near the blood clot, the clotted vessel, in other words. It would not be like the blood distribution that was found in this imagery. So that's very consistent. Wakeman also said that normally, if you had that type of thrombosis, you would have a stroke, and there was no stroke. So he looked at several indications here to rule out other possibilities. This was not, oh, he's got this triad, therefore. And I think Dr. Oppelman's real contribution, if you will, to how the medical community now has changed a little bit on their viewpoint is that she kept saying that these triads, the swelling, the retinal hemorrhaging, and the hemorrhaging in the brain altogether do not equal shaking. And that's what shaken baby syndrome really was at one point. Apparently if you had these triads, that was, you know, you had a diagnosis. That's no longer true. It's a differential diagnosis. But here they performed that. They looked at his history. They looked at his birth history. They also looked in terms of, you know, we have Dr. Oppelman saying this is a choking. In other words, she started with this is cessation of breathing, which causes the bleeding, just, you know, a leakage. And the leakage, in turn, causes the swelling. Can you distinguish the, I think it's pronounced Yohan, the Yohan case that counsel relies on? My reading of his brief, I'm kind of taking from that. He is stating that Yohan stands for the proposition that if you have conflicting medical evidence, that that would preclude conviction. Yes. And that's not what it says at all. Yohan was an abuse case. And what it, I believe what they did there is to say that there was a presumption once there was the triad of symptoms, there was a presumption of shaking that then had to be rebutted. I believe that's the way that went. So obviously that has really no application in this case. There was nothing like that done here. You know, we don't have not only a presumption, we don't have anybody that relied totally on this triad of symptoms to say, well, that's it, we saw these three things and we know from past experience this is a shaking case. That's not what they did. They said shaking came up as a possibility just like these other differential diagnoses. And then they started ruling things out. So they looked, in terms of, I just wanted to get into real quickly that Dr. Ogilvien's own opinion is suspect. She's talking about how not only should more things have been done, but she's coming from the viewpoint that it started with a breathing problem. But, of course, Dr. Glick says it couldn't have because that small leakage from the veins is not what we're seeing here. We're seeing, she claims it could be small too, but small but multiple and diffuse throughout the brain. She says, and when you put it all together, that's a large amount of blood. And, in fact, the swelling of the brain could even be sort of hiding more blood because that's what you often find in autopsies. But she said, nevertheless, that type of bleeding is not what we see here through two different layers. That's consistent with a shearing, which allows the blood to go quickly to two different layers of the brain. And so I just want to say that for Dr. Ogilvien, when she started with that, she was looking for reasons or things that could stop the breathing. So she looked into things like pneumonia. But here, while there was infiltrates in the lungs, we know he was vomiting. But he wasn't vomiting, according to the fetus's own testimony, until after CPR. Why was he doing CPR? Because the child was limp and unresponsive. There was no vomit on the blanket on which the child was laying at the time. This shows that, in fact, you know, it's consistent with what he says. He took the baby off, started CPR. And as the ambulance person said, when you start CPR, you start blowing into somebody's mouth and then pushing back on their chest. It's a symptom and not a cause. Yes, right. So, again, you know, she's taking a fact which actually is contradicted by the facts as we know them. She's also taking a fact that, so she said, you know, that's how he stopped breathing. Can I finish this? Okay. That's how he stopped breathing. But, in fact, it shows that he had some type of basic collapse before that ever became a problem, before the vomit ever became a problem. And then also, oh, she said that was the most likely cause, but that, you know, it could be something else that he was choking on. Again, I just go back to what else was there. Nobody ever found any sign of anything else. Nobody suggested that the child had anything with him in the car seat that he could have choked on. Nothing. He was there. He was fine. The defendant comes out of the bathroom or it depends on how, which of his two stories that he tells you believe. But he either came out of the bathroom and found the child or he just looked over and saw the child. The child is nonresponsive. Nothing to do with some type of foreign object being introduced. Anything further? Okay. Thank you, Your Honor. So we ask that you affirm the conviction. Thank you, Mr. Wilson. Mr. Holtgren. Your Honor, it says that if there is a reasonable explanation for what happened, that is a reasonable doubt. But in Yohan, the reasonable explanation was they had three doctors in that case that had no expertise in the diagnosis of rickets. I think I remember that being a big part of the reasonable doubt in that case. What is the smoking gun, if you will, in this case that you think makes this testimony contrary to the manifest way to the evidence? The saint just came up here and said there was no choking. Glick says that vomit can't cause the choking. If anything was proved beyond a reasonable doubt in this case, it's that he was choking on something. He's blue. The paramedic says something's blocking his airway. Who cares what's blocking his airway? No air is getting in there. It's blocked. We have a professional, a paramedic, trying to do CPR. No air goes in. What's the explanation for that? There's block. It's blocked. That's the explanation. This is a choking case. And to say, oh, he wasn't choking, there's nothing to choke on. Who cares what he's choking on? The evidence shows he was choking to death. No air was going in. How does the state explain that away? Children don't choke. Children don't stop breathing when they choke. That's nonsense. And in this case, that is the evidence. He's blue. Why do children turn blue? And then Glick goes out of her way in rebuttal to say, there was nothing wrong with his lungs. He was easy to oxygenate. And just repeatedly says, no pneumonia, no nothing. He was easy to oxygenate. Well, if he's easy to oxygenate, how come the professional can't? How come the professional can't? She said something's blocking his airway. The only way the air got in there was when the tube pushed through whatever the blockage was, whatever it was. Vomit, food, a piece of plastic. Who knows? Something was. That's what was proven in this case beyond a reasonable doubt. And to say that they did all sorts of tests to rule out something, they didn't do a single test to rule out anything. And the state just said that one of the reasons why Waken didn't order the MRV for thrombosis is because he said, well, you know, there should be some kind of stroke with it. Well, what about Glick's testimony on page 1,125? His MRI showed stroking. So why didn't he order the MRV? I know why. Because he told us. The argument seems to be based upon the presumption that the passageway was plugged with something akin to a cork as opposed to something blocking the passageway like Vaseline, petroleum, jelly. And in one instance when you push it, you supposedly push the plug and you push the plug further down the pipe until it supposedly falls out into a larger area and becomes essentially no longer a restriction passage. But if you push through petroleum jelly, you're not necessarily pushing it through and into a larger location. You're just spreading it along the walls, so to speak. And like an angiogram or an angioscope, you are opening the passage by literally spreading whatever it is that's blocking it. You are not pushing it someplace else where it falls out. What evidence is there that would suggest that you have established that this is a plug as opposed to petroleum jelly? I have none. All I have is the facts of this case that shows that he was choking to death. They put in a tube. Go ahead. They put in a tube and he immediately got oxygenated. That is the proof. Whether he was vomiting formula, is that correct? That's what the testimony is. Is formula more similar to a plug like a cork or is it more similar to petroleum jelly in the sense that it has an amorphous surface and a consistency that is capable of being spread apart and pushed aside?  Do you think the fact that there was no vomit on the blanket has any impact here? No. Why not? The evidence is he was choking to death. How does the State explain that away? I don't see any way to explain that away. If we accept this testimony, can I finish this? If we accept your testimony that every single choking case from here on out is a potential shaken baby case because, one, you don't have to have grabby marks. They said he grabbed him and shook him. Those are invisible. They said that he had no marks on his neck. Those are invisible. It could be a large amount of blood. It could be a small amount of blood. It doesn't matter according to Glick. How do you defend against invisible? How do you defend against, oh, it can be large or small? You don't need medical tests to rule out other causes if you personally believe that it's shaken baby syndrome and that choking doesn't stop a child from bleeding. How do you defend against that evidence? That's Glick's evidence. Every choking case is a shaken baby case now. Am I to understand that you're suggesting that there was no concrete evidence and that probably a motion for a directive verdict should have been filed? I don't see how the judge could have denied it based on Glick's testimony. Well, then, was there a motion for a directive verdict filed? I have to check my notes. I don't recall. Well, if there wasn't, did you consider filing a claim on appeal of ineffectiveness of counsel based upon the failure to file a motion for a directive verdict? No. But I don't think that would prevent this court from reversing a conviction that's based on less evidence that's required to support a conviction. Well, I'm attempting to get some reasonable consistency here. And if I accept at face value what you're saying, then it would seem to me that a reasonable individual would have done what I was suggesting maybe might have happened. And if it didn't happen, then maybe your argument isn't as strong as you might think it is. In other words, if somebody looks out the window and doesn't walk outside with an umbrella, it seems reasonable to conclude that it's not raining outside. Or the person is an idiot, one of the two. Okay? Or three, they're wearing reindeer and they don't need an umbrella. We can go on and on in any of that. Thank you. Thank you. Mr. Hildebrand, thank you for your argument. The case will be taken into consideration and the decision will be rendered in due course. We're in brief recess. Thank you. Thank you, folks.